(No. 6777—)

ORR CONSTRUCTION COMPANY, Claimant, *v.* STATE OF ILLI-NOIS, Respondent.

*Opinion filed December 2, 1977.*

HARRY M. BROSTOFF, Attorney for Claimant.

WILLIAM J. SCOTT, Attorney General; SAUL R. WEXLER, Assistant Attorney General, for Respondent.

HOLDERMAN, J.

This matter comes before the Court after a hearing by the Commissioner to determine the damages suffered by Claimant. Motion for summary judgment filed by Respondent was previously denied and the remaining issue is to determine the amount of damages sought by Claimant as a result of being required to use unsuitable material in the embankment.

Donald Orr, secretary of the Claimant company, called as a witness, identified certain documents as final estimates of quantities, payroll records, equipment records, statements of materials and labor on the Fayette Project.

Charles Covert, formerly employed by Claimant on the project in question as a grading supervisor, testified that the State engineers ordered Claimant to use excavated material, which was unsuitable, in the embankment. This was over the objection of the Claimant who wanted to use suitable borrowed material. The silty or unsuitable material would be put in the embankment and a lift of better earth or dirt would be placed in alternate layers; the lifts of the unsuitable and the better borrowed earth were then compacted; the equipment rutter and sank into the unsuitable material from one to three feet; the equipment was slowed down and sometimes the scraper and bulldozer would "drag bottom" necessitating the equipment being pushed or pulled by tractors. As a result of which, the construction of the road embankment was slowed down. He stated that silty material was soft and mushy causing the equipment to become rutted in.

Edwin Klump, Jr., Market Development Engineer for the Caterpillar Tractor Company, testified that he edited the Caterpillar performance handbook. This book is an estimator's guide in figuring production of the various Caterpillar machines. The book is a guide to earth moving and in it is a chart setting out production data on the "631" scraper used by the Claimant on this project.

Frank Bower, Senior Project Engineer, Terex Division at General Motors, identified performance charts for "S" 24 Graders used by Claimant in this project.

Charts are used to aid contractors in calculating productivity within the engineering department.

Charles Antonetti, former engineer and head estimator for Claimant, called as a witness, testified he prepared Claimant's estimate for the project in question; that they planned to waste the unsuitable material for the reason "that it has no stability" and "you can't travel on it."

He testified as to meetings regarding the handling of the unsuitable material, the Claimant wanting to waste it, the Respondent wanting to use it in the embankment. Using the State's methods, he stated, haul costs would be greatly increased. He testified that he prepared the claim filed in this cause. He further testified, "I took the performance chart from the equipment manufacturers and with the information I had from what had happened on the job, I prepared two sets of figures. One set of figures was based on our proposition and the way we wanted to bill the job. This entailed using a clay material and a particular depth of penetration in the tires of the machines, the hauling units, which would give us a calculated rolling resistance, which in turn would give us the speed of the equipment and the daily production of that piece of equipment. By taking that and taking our daily costs, I arrived at a cost per unit of material hauled. Then, I turned and took another set of figures based on the type of penetration that we were getting where we incorporated the unsuitable material in the embankments and calculated the rolling resistance under those conditions, got the daily production, put that into our daily cost, and came out with a unit cost, compared those two and took the difference and calculated our loss based on that information.

And, as far as the amount used, the amount of silty material incorporated in the embankments, I took from a set of figures that was prepared by the State of Illinois and used that in those particular embankments along with the other material that went in, which I also got from the State of Illinois."

He further testified, "In calculating these costs, I have taken all the information supplied by the State of Illinois as to where we had the unsuitable material, etc., and the amount that was incorporated in the fill and the amount that we hauled and put in stockpiles and brought back. And, then I attempted to arrive at the type of costs.

In my calculation, I have taken for the average spread a six scraper, which would contain six hauling units."

He stated, "And the daily cost with the corrected labor rates and health and welfare and ownership cost rather than a rental figure for the equipment and a fuel and maintenance cost came to $3,372.53 on a daily cost basis."

He further testified, "Once we decided on what the crew was, the daily cost, we went to the Caterpillar book which was previously introduced to get the hauling times or daily production in the two situations."

Q. "What do you mean by the two situations?

A. In situation 1, which would be the type of hauling conditions we had assumed when we bid the job using a clay material in the embankments. We calculated that our normal tire penetration would be approximately six inches by these machines, which in turn would give us a rolling resistance of roughly eleven percent, and give us a production of around ten to 12 loads per hour, which we apply our efficiency percentages to it. We came up with about between seven and one-half and eight loads production under the condition we asusme we were going to be using clay.

Then, I also did a set of calculations based upon the information I received from the job and some personal observations on the job where our

machines were just hanging up in the material. At that point the penetration is somewhere in the vicinity of three feet.

We were getting by report that we were going anywhere from a foot up to this just marred down position, which could be roughly three feet. And, I assumed an average penetration under these adverse conditions of approximately 24 inches for this calculation.

When I applied this to the normal formulas and sets presented in the book, I came up with a cycle that would produce around slightly over three loads per hour versus the seven and one-half to eight that we counted upon.

I divided those two. Well, I computed the daily production based on those two loads counts, 7.7 loads which gave us in excess of 10,000 yards, I believe, and 3.04 loads which gave us just slightly in excess of 3,600 yards.

I divided both of those in the daily cost of 3,300. I came up with a figure of 52.33 cent cost per cubic yard to move over the silty material versus a cost of 32.82 across the clay material. I then multiplied that by the amount of material.

Q. What is the difference?

A. The difference, I got the 19½ cents. Multiply that by the amount of material hauled over the unsuitable material in the embankment where unsuitable material had been placed, and that's how I came up with Count I.

Q. The recalculation total was how much?

A. I have it here some place. $375,508.98. The difference is 55.95."

He further testified, "When we're hauling over clay with six inch tire penetration, we arrive at a cost of .3649. And when we're hauling over the unsuitable material at the 3.04 loads, we arrive at a cost of .9244, which gives us a difference of .5595 cents per cubic yard hauling under the two types of conditions presented, one over clay and one over embankments with silty material incorporated.

Q. And that difference is the damage that was suffered by Orr Construction Company as a result of hauling that material over the unsuitable material as against hauling it over clay?

A. That's correct."

At the time of the hearing, the Claimant made a motion to amend Count I to read $375,508.98 instead of $402,000.00. No objection was made to the amendment, and the claim was amended as to that particular Count.

Claimant, at the time of the hearing, withdrew

Count II in the amount of $36,152.80. Claimant originally sought that sum for the furnishing of additional borrowed dirt.

As to Count III of the Complaint, Claimant seeks damages for having been required to haul empty to the borrow area and return loaded with borrowed excavation in the amount of 90,382 cubic yards of material. Claimant seeks damages in the amount of $17,624.49. Based upon specifications, field measurements and computations submitted to the Commissioner, the amount of cubic yards actually used was 31,885 yards at .195 per cubic yard, so that the Claimant has now reduced said claim to $6,217.58.

In Count IV, Claimant alleges that the unsuitable material elected by Claimant to be disposed of, on which basis Claimant has prepared its proposal, upon excavation would have become the property of Claimant. Claimant alleges that said material was suitable for topsoil required by the contract and Claimant used 50,990 cubic yards of said material for topsoil. Claimant alleges Respondent wrongfully deducted 27,239 cubic yards of said quantity from the measured borrow excavation and refused to pay Claimant for said amount deducted. Claimant alleges damages for this in the amount of $44,361.30. Submitted to the Commissioner was evidence that the amount of topsoil involved here was 27,239 cubic yards at .87 per cubic yard. This amount is determined by the job summary final quantity sheet. Claimant's claim in this Count is therefore reduced to $23,697.93.

Count V seeks the sum of $70,183.78 which was amended to $58,436.48, and is for damages due to the delay in completion of the mass excavation and embankment resulting from the order regarding the use of the unsuitable material.

It appears from the evidence that the delay involved in this project was primarily due to bad weather and was not any fault of the Respondent. An extension was requested by Claimant of 87½ days and it appears that 54½ days was granted by the Respondent. On the basis of such extension, Claimant withdrew Count V of the original complaint.

This matter was previously briefed and argued before the Court and for that reason the filing of additional briefs and abstracts have been waived.

From the evidence submitted, the Court believes that an award of damages be as follows:

As to Count I, an award in the amount of $375,508.98;

As to Count III, an award in the amount of $6,217.58;

As to Count IV, an award in the amount of $23,697.93,

for a total award to Claimant in the amount of $405,424.49.